# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| VERONICA ANNE JONES | § | |
| | § | |
| v. | § | CIVIL ACTION NO 4:15-CV-446 |
| | § | Judge Mazzant |
| BILLY MCINTOSH | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant Sergeant Billy McIntosh's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Traditional and No Evidence) (Dkt. #4) and Defendant Sergeant Billy McIntosh's First Supplement to His Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dkt. #37). After reviewing the relevant pleadings, the Court finds that the motions should be granted in part and denied in part.

### BACKGROUND

On Sunday, July 7, 2013, at approximately 2:55 a.m., Officer Tommy Johnson ("Johnson" or "Officer Johnson") of the Wylie Police Department ("WPD"), observed a vehicle traveling erratically and at a high rate of speed (Dkt. #4 at ¶ 5). "Using his calibrated radar, Officer Johnson determined the vehicle's speed to be 57mph in a 45mph speed zone." (Dkt. #4 at ¶ 5). Johnson pulled over the car, and when he approached the vehicle, he observed that the driver, Veronica Anne Jones ("Jones" or "Plaintiff") had red, watery eyes, and Johnson detected an odor of alcohol coming from the vehicle (Dkt. #4 at ¶ 5). Jones told Johnson that she had drunk three glasses of wine, taken an Ambien pill, and taken a muscle relaxer pill (Dkt. #4 at ¶ 5). "Plaintiff also said that she was going to pick up her 5-year old daughter." (Dkt. #4 at ¶ 5).

Johnson had Jones perform a Standard Field Sobriety Test, and based on Johnson's observations and Jones' failed performance, Jones was arrested for Driving While Intoxicated

1

("DWI") (Dkt. #4 at ¶¶ 5-6). "She was read her statutory warning which she indicated she understood." (Dkt. #4 at ¶ 6). "Plaintiff was transported to the WPD where she refused the breathalyzer; but, she consented to provide a blood specimen." (Dkt. #4 at ¶ 6).

Jones was subsequently taken to Lake Pointe Hospital where a blood specimen was drawn at approximately 3:55 a.m., and it was subsequently determined that Plaintiff's Blood Alcohol Count was 0.195, more than twice the legal limit (Dkt. #4 at ¶ 6). Plaintiff then returned to the WPD for book-in and processing (Dkt. #4 at ¶ 7). "During book in, Plaintiff was uncooperative and irate." (Dkt. #4 at ¶ 7). After book-in was complete, Johnson instructed Jones to go into a holding cell, but Jones refused (Dkt. #4 at ¶ 7). After multiple and failed requests, Officers Johnson and Brenda Martin ("Martin") physically took Plaintiff's arms and escorted her into a holding cell (Dkt. #4 at ¶ 7).

"Once in the cell, Plaintiff also refused Officer Johnson's repeated instruction to remove a ponytail holder/tie in her hair." (Dkt. #4 at ¶ 8). "The ponytail holder was collected as a safety precaution[,]" and Johnson removed it over Plaintiff's objections (Dkt. #4 at ¶ 8). Sergeant McIntosh ("McIntosh or "Defendant") heard the altercation (Dkt. #4 at ¶ 9). "He went to the female cell and found Officers Johnson, Martin and Brett Ward ("Officer Ward") in Plaintiff's cell." (Dkt. #4 at ¶ 9). McIntosh states that he "witnessed Johnson's requests, Plaintiff's physical refusal/resistance, and the Officers further/verbal request for compliance." (Dkt. #4 at ¶ 9). "McIntosh instructed the Officers to leave the holding cell, which they did, and the cell door was closed and locked. Plaintiff followed to the door still asserting a negative and non-compliant attitude." (Dkt. #4 at ¶ 9).

"WPD has a holding facility. It is not a jail, and violent/uncooperative/problematic arrestees are routinely transferred to the Collin County Jail ("CCJ")." (Dkt. #4 at ¶ 10). "Outside

Plaintiff's cell and in another room, Sergeant McIntosh instructed Officers, Johnson and Martin, to prepare Plaintiff for transfer to the CCJ." (Dkt. #4 at ¶ 10). According to McIntosh, "[t]hen, they heard mumbling and the sound of something being torn at the cell door. Following the sound, Sergeant McIntosh walked back toward Plaintiff's cell and several Officers followed. Upon arrival, they saw pages of the *Bible* flying out the food opening in the cell door." (Dkt. #4 at ¶ 10).

McIntosh alleges that "[w]ith the cell door still closed and locked, Sergeant McIntosh asked Plaintiff to give him the *Bible*. She replied 'No, come and get it.'" (Dkt. #4 at ¶ 11). McIntosh claims that he again asked for the *Bible* and he told her that she could be charged with Destruction of Property, but Jones still refused (Dkt. #4 at ¶ 11). According to McIntosh, "[t]he Officers were concerned that Plaintiff's conduct would escalate to additional destruction and/or personal injury." (Dkt. #4 at ¶ 11). McIntosh also alleges that "[b]ased upon Plaintiff's actions and the potential for escalation, [McIntosh] decided to re-enter her cell with Officers Johnson and Martin, get the *Bible*, and get Plaintiff to calm down/comply." (Dkt. #4 at ¶ 11).

McIntosh states that "Officer Martin, Officer Johnson and Sergeant McIntosh prepared to enter the cell. Once Sergeant McIntosh opened the cell door, Plaintiff moved back slightly." (Dkt. #4 at ¶ 12). McIntosh asserts that he held his hand out and said, "Give me the *Bible* now." (Dkt. #4 at ¶ 12). McIntosh claims that "Plaintiff again said 'No' and placed the book behind her back." (Dkt. #4 at ¶ 12). McIntosh claims that he stepped into the cell, put his left hand on Jones' left shoulder, turned Jones, and maneuvered her towards the wall (facing the wall between the bunk and the door) (Dkt. #4 at ¶ 12). McIntosh further alleges that with Jones' back to him, McIntosh took the *Bible* with his right hand and placed it on the top bunk (Dkt. #4 at ¶ 12).

According to McIntosh, when he was attempting to handcuff Jones, McIntosh "moved his

left hand down from Plaintiff's left shoulder to her left wrist. At the same time, Plaintiff brought her right leg up and kicked the Sergeant in the inside right thigh/groin area." (Dkt. #4 at ¶ 13). McIntosh asserts that "[t]he observing Officers believed that Plaintiff was trying to injure him." (Dkt. #4 at ¶ 13).

McIntosh further asserts that "[a]fter Plaintiff's blow, it was necessary to place her on the ground to more safely handcuff her and to minimize the potential for further violence." (Dkt. #4 at ¶ 13). McIntosh states that he sought to position Plaintiff in the cell and take her to the ground using a straight arm bar technique, which is taught in the Police Academy and Law Enforcement Training (Dkt. #4 at ¶ 13). McIntosh explains that "[t]his is part of a Police Officer's training and experience as a 'Basic', 'Intermediate', and/or 'Advanced' Peace Officer." (Dkt. #4 at ¶ 13).

McIntosh states that he sought to place Plaintiff safely on the ground without injury, and applied the arm bar technique in his attempt to do so (Dkt. #4 at ¶ 14). McIntosh claims that he pulled Plaintiff's left arm down (at her left wrist), to his left hip, and into the cell (Dkt. #4 at ¶ 14). McIntosh explains that "[a]s he turned, Plaintiff turned as well." (Dkt. #4 at ¶ 14). McIntosh contends that "[h]is right hand moved up from Plaintiff's left elbow/shoulder area to between her shoulders to gain control of her upper body; but, his hand never made contact." (Dkt. #4 at ¶ 14).

McIntosh pleads that "Plaintiff spun from him, avoided Officer Johnson's attempt to grasp her right arm, and stumbled uncontrollably to the floor. She fell hard." (Dkt. #4 at ¶ 14). McIntosh asserts that "[he] placed Plaintiff in handcuffs, moved her to a sitting position, and noticed the injuries." (Dkt. #4 at ¶ 15). According to McIntosh, when he asked Jones to stop fighting and she agreed, McIntosh uncuffed her, first aid was administered by another person, and an ambulance was dispatched to WPD (Dkt. #4 at ¶ 14). McIntosh asserts that "[g]iven

4

Plaintiff's agitated state, her refusal to follow verbal instructions, the destruction of property, her ongoing and physical resistance, and Plaintiff's assaults on Sergeant McIntosh and Officer Johnson, Plaintiff posed a threat of harm to property, persons, herself and the officers." (Dkt. #4 at ¶ 17). McIntosh alleges that "[f]rom the attending and reviewing Officers' perspective, the use of a straight arm bar, placing Plaintiff on the ground for cuffing, and the use of handcuffs was necessary, justified and reasonable. If Sergeant McIntosh had not done so, Jones would have continued her destructive acts on property and/or persons." (Dkt. #4 at ¶ 17). McIntosh pleads that, "[b]ased on the attending/reviewing Officers' perspective (Officers Johnson, Martin and Ward), Sergeant McIntosh's actions in Plaintiff Jones' cell were necessary, justified, and reasonable (not excessive)." (Dkt. #4 at ¶ 17).

Jones' expert Darrell Coslin ("Coslin") explains that he recognizes from the video that she attempted to kick McIntosh (Dkt. #40 at ¶ 3). Coslin claims that Jones was restrained except for her feet when McIntosh pinned her against the wall (Dkt. #40 at p. 6). Coslin further states that the other officers could "grab both arms and take her to the ground if they were going to take her to the ground." (Dkt. #40 at p. 6). Coslin asserts that a reasonable officer would not have used a straight arm bar technique "under this circumstance and this environment[.]" (Dkt. #40 at p. 6). Coslin went on to explain that "[w]e're working with such a confined space here and the absence of any padding whatsoever, and what makes it even more unreasonable was he already had control over the plaintiff here." (Dkt. #40 at p. 7).

Jones alleges that "Defendant grabbed Plaintiff by the arm, then grabbed the back of her head, and thrust her forward and downward in a violent manner[.]" (Dkt. #22 at p. 5). Jones explains that "[a]s a result of Defendant's force and the velocity of Defendant's actions towards Plaintiff, her body violently contacted the concrete floor of the cell with her face and mouth[.]"

5

(Dkt. #22 at p. 5). Jones asserts that "[she] hit the floor with such force that six of her teeth were knocked out or broken, her jaw bone was broken in two places, her ear drums were ruptured, and she sustained a laceration on her chin." (Dkt. #22 at p. 5).

On July 1, 2015, Jones filed her Complaint (Dkt. #1). On September 28, 2015, McIntosh filed his answer (Dkt. #2). On November 4, 2015, McIntosh filed his Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Traditional and No Evidence) (the "Motion") (Dkt. #4).[1] On November 18, 2015, Jones filed her First Amended Complaint alleging excessive force in violation of the Fourth Amendment or in the alternative, excessive force in violation of the Fourteenth Amendment (Dkt. #12). On January 6, 2016, Jones filed her response to the Motion (Dkt. #22). On January 13, 2016, McIntosh filed his reply in support of the Motion (Dkt. #24).

On May 9, 2016, McIntosh filed his Motion to Stay Proceedings Until Qualified Immunity Issue is Resolved (Dkt. #25). On June 6, 2016, the Court granted the Motion to Stay (Dkt. #31). On July 25, 2016, Defendant filed his First Supplement to his Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dkt. #37). On August 15, 2016, Plaintiff filed her response to the supplement (Dkt. #40).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits

---

[1] The Court will consider the Motion a motion for summary judgment because it was filed after McIntosh had filed his original answer on September 28, 2015 (Dkt. #2). Jones argues that federal law does not recognize a "no evidence" motion for summary judgment (Dkt. #22 at p. 8). Jones states that at the most, "federal law contemplates a shifting burden." The Court outlines the appropriate standard herein. While Jones argues that the motion for summary judgment was premature under FED. R. CIV. P. 56(d), and should be deferred or Plaintiff should be allowed to obtain additional discovery, the Court finds that Jones has not shown, for specific reasons, that she cannot present facts essential to justify her opposition. Therefore, the Court finds that the motion is not premature under FED. R. CIV. P. 56(d).

6

"[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor…unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004). Rather, the Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United*

*States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The Court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

*Fourteenth Amendment vs. Fourth Amendment*

Jones asserts a claim that McIntosh used excessive force in violation of the Fourth Amendment, or in the alternative, in violation of the Fourteenth Amendment (Dkt. #12 at ¶¶ 14 – 29). McIntosh asserts that "[t]he [Fourth] Amendment is not applicable to Plaintiff's detention claims. She previously was arrested, she previously gave a blood sample, she was booked into the holding facility, and she was placed into a cell." (Dkt. #4 at ¶ 39). McIntosh argues that "Plaintiff was a Pretrial Detainee (not an Arrestee) at the time of the alleged unconstitutional force/punishment." (Dkt. #4 at ¶ 39).

Jones contends that while it is established that the Fourteenth Amendment applies to a pre-trial detainee's excessive force claims, Jones was an arrestee at the time of the incident because she was arrested without a warrant, and was brought to WPD for book-in and processing (Dkt. #22 at p. 12 n. 37). Jones asserts that "[t]he majority of circuits hold that the Fourth Amendment applies until an individual arrested without a warrant appears before a neutral magistrate for arraignment or for a probable cause hearing or until the arrestee leaves the joint or sole custody of the arresting officer or officers." (Dkt. #22 at p. 12 n. 37). However, the Court finds that this standard does not apply to the case at hand.

In the Fifth Circuit, "[w]hile the Fourth Amendment protects arrestees, once an arrest is complete, pretrial detainees are protected by the due process clause of the Fifth or Fourteenth Amendments." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998); *see Brothers*

*v. Klevenhagen*, 28 F.3d 452, 455–56 (5th Cir. 1994); *Valencia v. Wiggins*, 981 F.2d 1440, 1445 (5th Cir. 1993). The point at which an arrest ends and pretrial detainment begins is not always clear. *See Valencia*, 981 F.2d at 1449 n. 44. However, the Fifth Circuit has held that the Fourth Amendment does not protect against deliberate uses of force that occur "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." *Id.* at 1443 (emphasis in original). It is only after these three circumstances occur that an arrestee, who was protected from excessive force under the Fourth Amendment, becomes a pretrial detainee who is protected under the Fourteenth Amendment.

The first circumstance is clearly established in the current case because, at the time of the event in question, the incidents of Jones' arrest were complete. Likewise, the second circumstance occurred because Jones had been left in the cell by Johnson, the arresting officer, before the incident. *See Brothers*, 28 F.3d at 457 ("Once an individual has been arrested and is placed into police custody, and surely after the arresting officer has transferred the individual to a jail cell, the individual becomes a pretrial detainee, protected against excessive force by the Due Process Clause."). Lastly, while less clear, the third circumstance occurred since the incident happened before Jones had been in detention awaiting trial.[2] Therefore, the Court finds that Jones' Fourth Amendment claim of excessive force should be dismissed and that the Court should consider Jones' excessive force claim under a Fourteen Amendment standard of analysis.

---

[2] In *Valencia*, the Fifth Circuit stated that the Fourth Amendment applies until "after the plaintiff has been in detention awaiting trial for a significant period of time." 981 F.2d at 1443. However, in *Brothers*, the Fifth Circuit greatly diminished the requirement that a plaintiff be detained for a "significant period of time" when it stated that, although Brothers only spent "several hours" in jail, "[i]f the incident had occurred several hours earlier, while Brothers was a resident of the Jersey Village Police Department jail, he surely would have been considered a pretrial detainee." 28 F.3d at 456. Therefore, while Jones was only detained in the cell for a few minutes before the incident occurred, the Court finds that she was a pretrial detainee.

*Excessive Force*

Jones alleges that McIntosh's actions violated her right to be free from excessive force (Dkt. #12 at ¶¶ 17-18). New legal standards are not applied retroactively for the purposes of qualified immunity. *Harper v. Harris Cnty., Tex.*, 21 F.3d 597, 601 (5th Cir. 1994) ("This Court has decisively rejected the retroactive application of new legal standards to excessive force claims involving qualified immunity, and has held that the objective reasonableness of a government official's conduct must be measured with reference to the law as it existed at the time of the conduct in question."). For years, courts in the Fifth Circuit have followed the rule that, "where a pretrial detainee is allegedly the victim of a detention officer's use of excessive force, as explained in *Valencia v. Wiggins*, 981 F.2d [at] 1446 [] . . . such a claim is subject to the same analysis as a convicted prisoner's claim for use of excessive force under the Eighth Amendment." *Thompson v. Beasley*, No. 4:14-cv-68, 309 F.R.D. 236, 246 (N.D. Miss. 2015) (citing *Kitchen v. Dall. Cnty.*, 759 F.3d 468, 477 (5th Cir. 2014)). "Under this standard, 'a constitutional violation occurs where a detention officer uses force maliciously and sadistically for the very purpose of causing harm to the pretrial detainee [or prisoner], rather than in a good faith effort to maintain or restore discipline." *Id.*

As set forth in *Hudson v. McMillian*, a constitutional violation occurs where a detention officer uses force "maliciously and sadistically for the very purpose of causing harm" to the pretrial detainee, rather than in "a good faith effort to maintain or restore discipline." 503 U.S. 1, 6 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The Supreme Court's decision in *Hudson* instructs courts to consider a number of factors when evaluating an excessive force claim. 503 U.S. at 7. These factors include (1) the extent of injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the

threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Id.* (citing *Whitley*, 475 U.S. at 321). The Court must determine if the submitted evidence creates a genuine dispute as to material facts regarding the *Hudson* factors in the present case. *Kitchen*, 759 F.3d at 477.

McIntosh asserts that Jones cannot meet the burden "of proving an unconstitutional force/punishment claim under the [Fourteenth Amendment]" (Dkt. #4 at ¶ 37). McIntosh argues that he acted to maintain and restore discipline, and that he used a normal straight arm bar procedure (Dkt. #4 at ¶ 37). McIntosh further asserts that "[h]e applied the procedure in the normal way and with a normal amount of force. Nothing in [McIntosh's] movement was excessive or unrelated to the need to maintain order in the holding facility." (Dkt. #4 at ¶ 37).[3]

McIntosh maintains that the force is undisputed and consists of: "[McIntosh] taking Plaintiff's left wrist in his left hand; pulling Plaintiff's left arm down and to his hip; and, turning himself and Plaintiff into the cell. Plaintiff avoided Officer Johnson, stumbled, and fell hard." (Dkt. #4 at ¶ 41). McIntosh contends that his "use of force in taking [Jones] to the ground was reasonable under the circumstances." (Dkt. #4 at ¶ 41).[4]

However, Jones' account of the force used differs significantly.[5] Jones' expert, Coslin, asserts that McIntosh performed the straight arm bar maneuver incorrectly when he took two

---

[3] McIntosh contends that it was reasonable for him to have used the straight arm bar takedown, a common technique taught to police officers in their academies, because Jones kicked him and was being non-compliant, and he believed that putting Jones on the ground minimized the possibility of more violence (Dkt. #37 at ¶¶ 24-28). McIntosh alleges that Jones was injured because she was "still being uncooperative [and] attempted to spin away from [him]." (Dkt. #37 at ¶ 29). According to McIntosh, through no fault of his own, what began as a controlled technique became an uncontrolled fall because of Jones' spinning." (Dkt. #37 at ¶ 29).

[4] McIntosh also states that it was reasonable for him to have entered Jones' cell (Dkt. #37 at ¶ 18). The Court assumes that McIntosh addresses this in response to Jones' expert, Mr. Coslin, stating that he would not have gone into Jones' cell after she had begun destroying the *Bible* (Dkt. #37 at ¶ 19). The Court finds it unnecessary to address this argument because the action of entering the cell did not cause the harm at issue.

[5] McIntosh asserts that "[Jones] is in no position to controvert the Wylie officers' statements and testimony regarding the incident that gave rise to the lawsuit[.]" (Dkt. #37 at ¶ 8). McIntosh states this based on the fact that Jones admits to not remembering many of the events of the evening (Dkt. #37 at ¶ 8). However, this is not a "he said she said" situation because of the video of the incident. Therefore, the fact that Jones does not remember the events in question is not case dispositive.

steps backward after being kicked (Dkt. #22-2 at ¶ 39). Likewise, Coslin "surmises that Sgt. McIntosh puts his right hand on top of the Plaintiff's head and drives her into the floor." (Dkt. #37 at ¶ 35 (citing Dkt. #22-2 at ¶ 34)). McIntosh admits that "the video is so grainy that, after watching it many times he can only say that 'with the color of her hair and my arm, it's just a huge blur.'" (Dkt. #37 at ¶ 35). McIntosh argues that while Coslin claims to see his hand, "[n]othing in that fraction of a second is 'clearly' visible." (Dkt. #37).

McIntosh asserts that Coslin's testimony concerning whether or not he was able to see McIntosh's hand actually force Jones' head down should be disregarded because Coslin's expertise is in police procedure and conduct, not video interpretation (Dkt. #37 at ¶ 36). The Court agrees that Coslin's expertise is not in video interpretation. However, the video itself creates a question of fact as to whether or not McIntosh pushed Jones' head down to the floor.[6] This is supported by McIntosh's own testimony that when he watches the video, he cannot see where his hand was in relation to Jones' head. Therefore, the Court finds that there is a question of fact as to whether or not McIntosh pushed Jones' head down.

McIntosh argues that "[t]his is not the first incident of intoxicated persons injuring themselves by resisting officers attempting a straight arm bar takedown." (Dkt. #37 at p. 9 (citing *Cardinal v. Allain*, No. CV-05-107-JJB, 2007 WL 3256447, at *4 (M.D. La. Nov. 5, 2007))). McIntosh explains that, in *Cardinal*, the district court found that "'[the straight arm bar] tactic was not excessive force because [the plaintiff] was jerking way from [the officer] to prevent [the officer] from handcuffing him' and that it was '[the plaintiff's] conduct and intoxicated state

---

[6] McIntosh asserts that "a grainy video does not create a genuine issue of material fact. The video is good evidence for other contentions, but not whether Sgt. McIntosh's hand was on the Plaintiff's head driving her into the floor. In fact, the video is not credible evidence as whether Sgt. McIntosh's hand ever touched the Plaintiff's head." (Dkt. #37 at ¶ 37). McIntosh goes on to state that "[w]hat the Court has regarding that issue, is the testimony of three police officers all of whom testify that Sgt. McIntosh's right hand never touched the Plaintiff during her fall." (Dkt. #37 at ¶ 37). The Court finds this argument unpersuasive. The video, although imperfect, is material as to whether or not McIntosh pushed Jones' head towards the ground.

which created the situation at issue.'" (Dkt. #37 at pp. 9-10 (citing *Cardinal*, 2007 WL 3256447, at *4)). McIntosh is essentially arguing that Jones' intoxication and noncompliance were the source of her injury, and that McIntosh's force did not cause the harm at issue. However, the Court finds that the current situation is substantially different from *Cardinal*.

Here, there is a factual dispute about whether or not Jones' injuries were sustained as a result of the officer doing more than just the straight arm bar technique. Jones has presented summary judgment evidence from an expert that the straight arm bar technique was done in an unsuitable environment, and she has presented evidence that supports a finding that the officer not only did the technique, but then pushed her head into the ground as she fell. In *Cardinal*, however, the court noted that "[t]here was no evidence presented that the tactic [the officer] used was out of the ordinary, or unnecessary given the circumstances." 2007 WL 3256447, at *4. Therefore, the Court finds that the case at hand is distinguishable from *Cardinal* because Jones has presented evidence that the tactic used was out of the ordinary, and unsuitable in the environment in which it was performed.

The analysis of whether or not McIntosh violated Jones' Fourteenth Amendment right to due process must be done with consideration that there is a factual dispute regarding the force that is at issue. While McIntosh asserts that the force used was a straight arm takedown gone awry due to Jones' actions, Jones' asserts that this was a takedown followed by an officer forcing a falling detainee's head into the floor. The nature of the factual dispute affects the Court's analysis of each of the *Hudson* factors. After a careful review of the record and the arguments presented, the Court is not convinced that McIntosh has met his burden demonstrating that there is no material issue of fact entitling him to judgment as a matter of law on the issue of whether or not he violated Jones' Fourteenth Amendment due process right to be free from excessive force.

The issue should proceed to trial.

*Qualified Immunity*

McIntosh argues that he is entitled to qualified immunity. "Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citing *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)). This standard, even on summary judgment, "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations omitted). "The doctrine of qualified immunity shields government officials from liability when they are acting within their discretionary authority, so long as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Wallace v. Cty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The Supreme Court has established a two-part test to be applied in determining whether the presumption of qualified immunity is to be overcome. "First, a court must decide whether a plaintiff's allegation, if true, establishes a violation of a clearly established right." *Hernandez ex rel. Hernandez v. Texas Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004). "Second, if the plaintiff has alleged a violation, the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident." *Id*. "Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Id*. Analysis of these issues does not need to proceed in a specific sequence. *Pearson v. Callahan*, 555 U.S. 223 (2009). "As the qualified immunity defense has evolved, it provides ample

protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As discussed above, the Court concludes that Jones has presented sufficient evidence to establish that a question of fact exists as to whether McIntosh violated Jones' Fourteenth Amendment due process right to be free of excessive force. Additionally, the Court finds that within the Fifth Circuit, there was clearly established law at the time of the incident that detention facility employees could be liable for excessive force against pretrial detainees. *See Bishop*, 2015 WL 8273986, \*4-5 (explaining that the *Kitche*n court held that the theory of bystander liability was applicable to claims of excessive force brought by pretrial detainees, and that if bystander liability for excessive force was established, direct liability must also have been established).

The Court now turns to whether or not McIntosh's conduct was objectively reasonable. The relevant question is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202. Jones has submitted expert testimony that McIntosh's conduct was clearly unreasonable in light of the situation (Dkt. #40 at pp. 5-9). Jones has submitted summary judgment evidence that is sufficient to create a question of fact regarding whether other officers would find it clear that McIntosh's actions were unlawful. Considering the facts in the light most favorable to Jones, it may not be reasonable for an officer to perform the technique McIntosh used in the situation at issue. Simply put, Jones has demonstrated that a question of fact exists as to whether it would be clear to a reasonable officer that McIntosh's actions were unlawful.[7]

---

[7] Also in support of his Motion, McIntosh asserts that this case is distinguishable from other cases in which courts denied summary judgment based on qualified immunity because an officer's use of force was "clearly excessive and clearly unreasonable under the circumstances." (Dkt. #37 at ¶ 40). McIntosh begins by asking "the Court to note the differences between the facts leading to the *Geils* decision and the case at bar." (Dkt. #37 at ¶ 41).

*Seizure*

Jones alleges that "McIntosh, acting under color of law, deprived Plaintiff of certain constitutionally protected rights wherein Defendant . . . [m]ade an unlawful and unreasonable seizure of the Plaintiff's person[.]" (Dkt. #12 at p. 3). McIntosh argues that "Plaintiff cannot . . . sufficiently prove an unreasonable seizure of her person[.]" (Dkt. #4 at ¶ 45).[8] The Court finds that, for the reasons discussed herein, Jones does not have the ability to bring Fourth Amendment claims, because she was a pretrial detainee and not an arrestee according to Fifth Circuit law. Therefore, Jones' claim of unlawful seizure should be dismissed.

## CONCLUSION

It is therefore **ORDERED** that Defendant Sergeant Billy McIntosh's Motion to Dismiss,

---

*Geils v. Patin* is a Northern District of Texas case in which a plaintiff claimed that an officer used excessive force when he slammed the plaintiff's head into a lockbox during the book-in process. 941 F. Supp. 2d 722, 725. In *Geils*, the officer claimed that he used a reasonable amount of force in pulling the non-compliant plaintiff to a standing position, but the plaintiff's intoxication caused him to propel forward and sustain injury. *Id.* However, after reviewing the surveillance video, the court found that while the plaintiff was verbally uncooperative and disrespectful, he was not physically resisting or threatening toward any officers at any time leading up to the incident. *Id.* at 728. Additionally, the court found that the officer's secure hold on the plaintiff, and his control over the plaintiff's movements through the point of impact, established that it was the officer's use of force and not the plaintiff's drunkenness that caused the injury at issue. *Id.* McIntosh also asserts that there are differences between the current case and *Bishop v. City of Denton, Texas*. No. 4:14-CV-608, 2015 WL 8273986, at *1 (E.D. Tex. Dec. 8, 2015), appeal dismissed (Mar. 24, 2016).

McIntosh argues that the current case is distinguishable from *Geils* and *Bishop* for several reasons. First, McIntosh notes that "[t]he *Geils* court noted that '[a]bsent from the video is any indication that Geils . . . is physically resisting or physically threatening toward Officer Patin or the other officers at any time leading up to the incident." (Dkt. #37 at ¶ 40). Likewise, in *Bishop*, the Court also noted that Bishop, while noncompliant, was not actively resisting the officers. While the Court agrees with McIntosh that there is evidence in the current case that Jones was resisting an officer, this does not make the force used by McIntosh reasonable. This is especially true in light of Coslin's testimony that, except for her feet, Jones was restrained against the wall. Additionally, the fact that there were several officers very close to Jones at the time of the incident also makes it appear that there is a question of fact as to whether the force used against her was reasonable, even given the fact that she was resisting.

McIntosh also asserts that in both *Geils* and *Bishop*, the Courts determined that the officer had control of the plaintiffs at the time of the incident. McIntosh asserts that because it is unclear whether or not he had control over Jones, summary judgment should be granted against her claims. However, the Court finds that the amount of control that McIntosh had over Jones is a question of fact appropriate for a jury's consideration.

[8] Jones does not mention the word "seize" or "seizure" in her response to McIntosh's motion (Dkt. #22). Likewise, Jones only mentions the word in her response to McIntosh's supplement to state that "Defendant has correctly noted that Plaintiff brings federal claims against Sergeant McIntosh based on alleged use of excessive force and unreasonable seizure of her person. Plaintiff further acknowledges that she bears the pleading and evidentiary burdens to overcome Defendant's qualified-immunity defense." (Dkt. #40 at p. 2). Jones asserts no facts or argument in support of her claim that she was unreasonably and unlawfully seized, separate and apart from her complaint of excessive force against McIntosh.

or in the Alternative, Motion for Summary Judgment (Traditional and No Evidence) (Dkt. #4) and Defendant Sergeant Billy McIntosh's First Supplement to His Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dkt. #37) are hereby **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Jones' claims of unlawful seizure and excessive force under the Fourth Amendment are hereby **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Jones' claim of excessive force in violation of her right to due process under the Fourteenth Amendment should proceed to trial.

**SIGNED this 22nd day of August, 2016.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE